

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **EVERETT KIRBY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 4:08-CV-848-VEH** |
| | ) | |
| **THE HARTFORD,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM OPINION

## I.      INTRODUCTION

Currently before the Court is the Motion for Judgment on the Record[1] (Doc.

---

[1] Plaintiff likely filed the instant "Motion for Judgment on the Record" in light of the Eleventh Circuit's recent decision in *Doyle v. Liberty Life Assur. Co.*, 542 F.3d 1352 (11th Cir. 2008).  In *Doyle*, the Eleventh Circuit noted that, due to the peculiar standards of review for ERISA cases, Rule 56 practice may be unnecessary. *Id.* at 1363 n.5.  Other district courts have similarly noted that the district court's role in an ERISA case is fundamentally different than its ordinary role as a trial court.  *See Providence v. Hartford Life & Accident Ins. Co.*, 357 F. Supp. 2d 1341, 1342 n.1 (M.D. Fla. 2005) ("[T]he Court's task is to review the benefit decision based on the administrative record available to the decision maker at the time he or she made the decision."). However, the court in *Doyle* made this conclusion only in dicta, and it noted that the cased involved the administrative record alone, and not outside evidence.  As evidenced by the Motion to Strike (Doc. 17), Plaintiff seeks to supplement the record with additional evidence.  Thus, the reasoning in *Doyle* may not apply.  Additionally, in his reply brief, Kirby appears to have abandoned his decision to style the motion as a request for "judgment on the record" because he has referred to his pending motion as a motion for summary judgment.  (*See* Doc. 20 at 1, 10.)  Thus, the Court will address this motion as a motion for summary judgment.

11), filed by the Plaintiff, Everett Kirby ("Kirby").   Defendant, the Hartford ("Hartford"), has also filed a Motion for Summary Judgment (Doc. 14), as well as a Motion to Strike Plaintiff's Affidavit (Doc. 17).   The above-described motions are now under submission to this Court.

This case, brought under ERISA, involves Kirby's challenge to  Hartford's decision to terminate his long term disability benefits provided through Hartford's insurance contract with Kirby's former employer.   Hartford terminated Kirby's benefits after conducting surveillance on him and determining that he did not suffer from the degree of limitations that he had previously reported and after the Plaintiff's only treating physician released Kirby to full-time employment.   Because the Court finds that Hartford reached a correct decision, based on a *de novo* review of the evidence, the Court finds that Hartford's Motion for Summary Judgment is due to be **GRANTED** and the Plaintiff's Motion for Judgment on the Record is due to be **DENIED**.   Finally, the Defendant's Motion to Strike is due to be **DENIED**.

## II.   DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S AFFIDAVIT

The Court first turns to Hartford's Motion to Strike Plaintiff's Affidavit (Doc. 17), which, as its name suggests, seeks to remove from the Court's consideration Kirby's affidavit submitted in support of his Motion for Judgment on the Record. (Doc. 11, Kirby Aff.)  This motion seeks to strike Kirby's affidavit because Hartford

2

argues that under the applicable standard of review, the Court cannot consider evidence outside of the administrative record. (Doc. 17 at 1-2.)  Kirby's one-page affidavit is a relatively innocuous document, containing a summary of the Plaintiff's education, work history, and his own self-reported health problems. (*Id.*)[2]

The resolution of this motion depends upon whether the ERISA plan at issue grants Hartford complete discretion to make benefits determinations.   This determination also has substantive effects on the pending motion for summary judgment, as discussed *infra*, since it also determines the applicable standard of judicial review for this case.   For purposes of the instant motion, the applicable standard of review under ERISA is not of consequence.  If an ERISA plan vests a plan administrator with discretion, then the Court may only consider the evidence the administrator was aware of at the time of its decision, but  if the administrator has not been vested with discretion, the Court is not limited to the facts known to the administrator at the time of its decision. *See Scippio v. Florida Combined Life Ins. Co.*, 585 F. Supp. 2d 1317, 1328 (N.D. Fla. 2008) (citing *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir.2008); *Kirwan v. Marriott Corp.*, 10 F.3d 784, 789 (11th Cir.1994)).

---

[2]  As discussed *infra* in noting that Kirby has been less than forthright in describing his condition to his healthcare providers, the Court has good reason to give little weight to Kirby's self-serving affidavit when considering the merits of the pending dispositive motions.

Hartford's policy purports to confer upon itself "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (Doc. 16, AR at 27 (hereinafter "AR at __")[3].) However, the policy also contains a separate section entitled "ERISA," which states, "[f]or the purpose of meeting certain requirements of [ERISA], the following information and the attached Claim Procedures and Statement of ERISA Rights are provided for use with your booklet-certificate to form the Summary Plan Description." (AR at 32.) Listed below this statement, Hartford identifies the "Plan Administrator" as Visador. (AR at 32.) It further states under the heading "Type of Administration" that "[t]he plan is administered by the Plan Administrator with benefits provided in accordance with the provisions of the applicable group plan." (AR at 33.) This section also states that the Plan Administrator has full authority, at its sole discretion, to "terminate, suspend, withdraw, reduce or modify the Plan, in whole or in part, at any time . . . ." (AR at 33.) Further, the "ERISA" section describes the necessary procedure for making a benefits claim, noting that "the claim form(s) must be forwarded to the individual authorized to evaluate claims ([the Plan] Administrator or Insurance Company's Claim Representative). The individual

---

[3] The Defendant filed the entire administrative record of Kirby's claim file at Doc. 16, Ex. 1 to Ex. A, Parts 1-17.

authorized to evaluate claims will determine if benefits are payable and, if due, issue

payment(s) to you."  (AR at 35.)

The Court must look to all of the plan documents to determine whether the plan

affords Hartford discretion in making benefits determinations.  *Cagle v. Bruner*, 112

F.3d 1510, 1517 (11th Cir. 1997).  Although Hartford contends that it is undisputed

that it has full discretion to determine eligibility benefits or to construe terms of the

plan, this contention is incorrect.   The plan must <u>expressly</u> grant Hartford authority

to make eligibility determinations or construe the plan's terms.  *See Kirwain v.*

*Marriott Corp.*, 10 F.3d 784, 788 (11th Cir. 1994).  Here, the plan documents, viewed

as a whole, do not amount to an express grant of discretionary authority.  Hartford's

policy contains an ERISA section that designates Visador as plan administrator and

indicates that the designated plan administrator may have the ultimate responsibility

for making benefits determinations.  Although a separate portion of Hartford's policy

purports to give full discretion to Hartford in making benefits determinations,

Hartford's own ERISA statement is ambiguous, and it appears to grant Visador the

authority to make benefits determinations.  Further, there is no indication that the

policy has been amended or that this statement has somehow been modified by the

plan administrator.

Therefore, in the absence of evidence to the contrary, the Court cannot find that

the plan documents expressly grant Hartford the authority to make benefits determinations.  Consequently, the motion to strike is **DENIED**, as the Court is not limited to the administrative record in making its determination.

## III.   CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A.   Summary Judgment Standard of Review

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id*. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id*. (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be

6

drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir.1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir.1987) (citation omitted).

## B.    Relevant Undisputed Facts[4]

Plaintiff Everett Kirby ("Kirby") was hired by his former employer, Visador Company, LLC ("Visador") as a Mold Prep/ Mold Changer in January, 2001, and worked until July, 2002.  (AR at 716.) This job involved walking, standing, and lifting of up to fifty points.  (AR at 25.)  Kirby was 44 years old at the time he stopped working.  (AR at 689.)  He has a history of tuberculosis, and he used tobacco products until 1995.  (*Id.*)

Hartford issued a Group Long-Term Disability Policy to Visador, insuring the

_____

[4] Although the Court treats the pending motions as cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law.  *See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S.*, 224 F.2d 338, 345 (5th Cir. 1955); *Matter of Lanting*, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996). The court will consider each motion independently and in accordance with the Rule 56 standard. *See Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit."  *See* Wright, Miller & Kane, *Federal Practice and Procedure* § 2720, at 327-28 (3d ed. 1998).

These are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

long term disability ('LTD') component of Visador's employee benefit plan.  (Def's

MSJ, AF[5] 1.)  The policy states that benefits become available to a Visador employee

if he or she becomes "disabled" under the terms of the policy, and benefits terminate

if the employee is no longer found to be disabled.  (AR at 18-19.)   As defined by the

policy:

> [D]isability or disabled means that during the Elimination Period[6] and
> for the next 24 months, you are prevented by:
> 1.      accidental bodily injury;
> 2.      sickness;
> 3.      Mental Illness;
> 4.      Substance Abuse; or
> 5.      Pregnancy
> from performing one or more of the Essential Duties of Your
> Occupation . . . .

---

[5] The designation "AF" stands for admitted fact and indicates a fact offered by the moving party that the non-movant has admitted in written submissions on summary judgment, or by virtue of any other evidence offered in support of the case.  Whenever the non-movant has adequately disputed a fact offered by the movant, the court has accepted the non-movant's version. In this case, both Plaintiff and Defendant have filed motions for summary judgment. The court's numbering of admitted facts (e.g., AF 1), therefore, corresponds to the numbering of the movant's Statement of Facts as set forth in Docs.  12 and 15 and responded to by the nonmovant in Docs. 18 and 21 *as amended by* 22.  To distinguish between admitted facts in Plaintiff's motion for summary judgment, and Defendant's motion for summary judgment, the court identifies which party's motion for summary judgment an admitted fact comes from (e.g., Def's MSJ, AF 1; Pl's MSJ, AF 1).

The designation "AAF" stands for additional admitted fact and corresponds to the nonmovant's Statement of Facts contained in Doc. 21 (as amended) and responded to by the movant in Doc. 23.  Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

[6] As defined by the policy, "[t]he Elimination Period is the time you must be Disabled before benefits become payable."  (AR at 16.)

(AR at 28.)  After the twenty four (24) months following the Elimination Period, an employee is disabled only if he or she is "prevented from performing one or more of the Essential Duties of Any Occupation," thereby entitling the employee to long term disability benefits.  (*Id.*)

Kirby ceased work in July, 2002, due to the discovery of a nodule in his lung. (AR at 16, 23.)  Dr. Edward Ferguson, a cardiovascular surgeon, removed the nodule, which was found to be a benign lesion, in August of the same year.  (Def's MSJ, AF 7; AR at 662, 687.)  However, reactive tissue tested positive for tuberculosis and, at the time of his discharge, Kirby was in contact with the Etowah County Health Department and was being treated for the possible reactivation of his tuberculosis. (AR at 662.)

In April, 2003, Kirby underwent a follow-up pulmonary function test, which revealed normal lung volume.  (Def's MSJ, AF 13.)  Subsequently, in December, 2003, Kirby submitted an updated questionnaire response to Hartford, describing his medical conditions as "asthma, infected left lung, cancerous growth removed from lower right lobe of right lung, hypertension, frequent headaches, sleeplessness, and depression."  (Def's MSJ, AF 14.)

In April, 2004, Hartford sent Kirby a letter explaining the requirements for his continued receipt of LTD benefits, specifically noting that the initial twenty four

month period would expire in October, 2004, thereby requiring Kirby to meet the "Any Occupation" standard. (Def's MSJ, AF 16; AR at 459.) This letter also advised Kirby that Hartford would be conducting an investigation to determine whether he qualified for future LTD benefits, noting that it would request additional information from his treating physician, Dr. Akinsanya. (AR at 460.)

Hartford's Nurse Case Manager began conducting her review, and in June, 2004, she spoke with Dr. Akinsanya, who reported that Kirby did not have active tuberculosis, and that his hypertension was stable. (Def's MSJ AF 19.) Dr. Akinsanya further indicated that he believed Kirby could perform light duty work, but he wanted to confer with Kirby's pulmonologist, Dr. Hakim, before committing to his opinion. (AR at 68.) Updated medical records reflected a June, 2004, pulmonary function test, revealing "minimal obstructive lung defect" with a "mild decrease in diffusing capacity," and a chest CT Scan, when compared with a December, 2003, scan, revealed "no significant interval change" with "stable" scarring. (Def's MSJ, AF 20.) In July, 2005, Dr. Akinsanya provided Hartford with an Attending Pysician's Statement of Continued Disability form and stated that he saw Kirby on a quarterly basis and that he had not referred Kirby to any specialist; Kirby was also receiving treatment through prescription medications. (Def's MSJ, AF 21; AR at 384.) Dr. Akinsanya further stated that Kirby should have no limitations with respect to

10

standing, sitting, driving, or using a keyboard.  (AR at 385.)  However, he did indicate that Kirby would be limited in performing activities that involved walking, lifting, reaching, pushing, and pulling, and Dr. Akinsanya further stated that Kirby would suffer from shortness of breath upon exertion. (*Id.*)  Dr. Akinsanya repeated these same limitations in June, 2006; Kirby's latest test results at this point were from 2004.  (Def's MSJ, AF 23.)  The findings upon his physical examination of Kirby were described as "unremarkable."  (*Id.*)

In June, 2006, Kirby submitted a  Claimant Questionnaire,  in  which  he confirmed that he had not seen a specialist in the past 18 months and that he could perform all of the activities of daily living, unassisted.  (Def's MSJ, AF 24.)  At this time, he described his disabling conditions as "uncontrolled hypertension, shortness of breath due to incapacitated lung (due to surgery), acid reflux and depression." (*Id.*)

One year later, in June, 2007, Kirby indicated that there had been no change in his condition and that his sole treating physician was Dr. Akinsanya.  (Def's MSJ, AF 25.) Dr. Akinsanya's functional assessments and treatment plan remained unchanged. (Def's MSJ, AF 26.)  His last objective test results were three years old at this time. (*Id.*)  At this time, Hartford referred Kirby's claim for surveillance, noting that he was rarely home to answer the phone, that his unsigned claimant questionnaire appeared to have been completed by someone else, and that Kirby was being treated

only by a primary care physician.  (Def's MSJ, AF 27.)

Hartford then hired investigators to conduct surveillance on Kirby in July, 2007.  (Def's MSJ, AF 28.)  The investigators observed Kirby away from and around his residence for over three days, during which they observed Kirby performing activities such as walking, standing, bending approximately 90 degrees at the waist to pick up debris in his yard, carrying various items, raising his hand to shoulder level, walking up stairs, bending his knees, twisting his torso, entering and exiting a vehicle, as well as operating a vehicle without any restrictions.  (*Id.*)  Kirby did not use any braces, canes, or other aids to assist in any of these activities.  (*Id.*)

In August, 2007, Hartford conducted an in-person interview with Kirby at his home.  (Def's MSJ, AF 29.)  The interviewer observed that Kirby walked with a smooth stride and a stable gait, did not demonstrate any objective signs of difficulty while walking, and did not complain of shortness of breath.  (Def's MSJ, AF 30.)  The interviewer also noted that Kirby could stand without support, and was able to sit for the entire interview (which lasted for more than 2 hours) without any difficulty.  (*Id.*)  During this interview, Kirby never complained of pain, fatigue, or shortness of breath.  (*Id.*)  Although surveillance video indicated otherwise, Kirby maintained that he used an electric chair around his house and a cane 100% of the time away from his house.  (Def's MSJ, AF 31.)  During the interview, Kirby also provided a continuing

statement of disability, maintaining that he had COPD, experienced shortness of breath upon physical exertion, that he had the majority of his right lung removed surgically, that he had been diagnosed with lung cancer, and that he could not perform any physical activity without shortness of breath.  (Def's MSJ AF 32.) Further, Kirby admitted that his only treating physician was Dr. Akinsanya and that his only current treatment or therapy was medication.  (Def's MSJ, AF 33; AF at 348.)

During the interview, Kirby also described his own maximum level of functionality.  (AR at 349.)   He stated that, at his own maximum level of functionality, he could: (1) walk up to 1/4 mile; (2) shop at smaller grocery stores, where he did not have to walk very far; (3) stand without restriction; (4) carry items that weigh 50 pounds, since he uses that weight to perform exercise repetitions; (5) bend at the waist (although he claimed to experience headaches in performing this action due to high blood pressure); (6) squat and kneel; (7) sit without restriction; (8) push and pull objects that do not offer resistance; (9) drive without restriction, but had difficulty getting in and out of the car.  (Def's MSJ, AF 34; AR at 753-755.) Kirby also stated that he never walked up and down stairs because it would cause him shortness of breath and that he had not even tried to walk up and down stairs since his illness began.  (*Id.*; AR at 754.)  Kirby also reported that he could not work, but

that he could  clean his house, do laundry, and cook.  (Def's MSJ, AF 35.) Hartford then showed Kirby the surveillance tapes, and he reported that the activities on the tape were what he did on a typical day and it reflected his current level of functionality.  (Def's MSJ, AF 38.)

Subsequent to the interview, Kirby's attorney requested a psychological evaluation, which was performed by Dr. David Wilson.  (Def's MSJ, AF 41; AR at 320.)  Kirby told Dr. Wilson that he had undergone surgery for lung cancer and that he was under continuing treatment for cancer; he also stated that he was taking "so much medication [that he did not] know the name of it."  (Def's MSJ, AF 43.)  Dr. Wilson concluded that Kirby was an "angry and agitated individual and he apparently has had someone tell him that he was 'faking' and that he could go back to work, even though he has had what appears to be serious problems related to his lung cancer." (Def's MSJ AF 44.)  Dr. Wilson further noted that Kirby should be on some form of anti-depressant and that it was "unlikely [that] he could function in a work setting."  (*Id.*)  Based on this single examination, Dr. Wilson concluded that Kirby suffered from "Major Depression, Recurrent" and gave Kirby a "GAF=50" score, which means "[s]erious symptoms . . . OR any serious impairment in social, occupation or school functioning . . . ."  (Def's MSJ, AAF 11-12.)

In September, 2007, a Nurse Case Manager for Hartford reviewed Kirby's

medical records, the surveillance tapes of his activity, and his subsequent interview. (Def's MSJ, AF 45.)   She noted that, although Kirby complained of shortness of breath, the records stated that he was "in no acute distress." (*Id.*)   She further noted that there was no testing to determine whether the shortness of breath was from a cardiac cause. (*Id.*)   She recognized that he was not being treated by a pulmonologist and that, although he claimed to be suffering from cancer, no medical records supported this claim. (*Id.*)   She also stated that "the current diagnosis is mild restrictive lung defect."   Further, although she recognized that Dr. Wilson had determined that Kirby could not function in a work setting, he was not receiving any psychotherapy or psychiatric medication. (*Id.*)   Finally, she noted that the functionality seen in the surveillance videos do not support Kirby's "inability to perform a full time occupation from a mental or physical standpoint." (*Id.*)

Hartford later followed up with Dr. Wilson by sending him the surveillance tapes of Kirby and explaining that Kirby had no history of lung cancer. (Def's MSJ, AF 46.)   Hartford also provided Dr. Wilson with a form describing sedentary, light, and medium occupations, and asking whether Dr. Wilson believed that Kirby could perform any occupation in view of this new information. (*Id.*)   Wilson replied that he was "unable to comment." (Def's MSJ, AF 47.)   When provided with this same information, Dr. Akinsaya responded that, in  his professional opinion, Kirby was

capable of performing a full time medium occupation as defined by the Department of Labor's *Dictionary of Occupational Titles*. (AR at 310.) He did not recommend any additional restrictions or limitations for Kirby. (*Id.*)

Hartford then performed an employability analysis for Kirby and identified six occupations, ranging from sedentary to medium, that Kirby could perform and that were prevalent in the national economy. (AR at 288, 290.) Upon the conclusion of the employability analysis, Hartford informed Kirby, via letter, that his benefits would no longer be payable as of November 1, 2007. (Def's MSJ AF 52.) The letter explained all of the evidence Hartford considered in reaching its decision and explained its conclusion that Kirby could perform medium work. (*Id.*) As the basis for terminating Kirby's LTD benefits, Hartford explained that it had documented, through its surveillance, Kirby's level of activity and that Kirby had provided certain "inconsistencies" during his subsequent interview that did not comport with what the surveillance video had captured. (AR at 107.) For instance, Hartford noted Kirby's misrepresentation of the fact that he needed a cane and an electric cart for mobility and that he could not use stairs. (*Id.*) Additionally, it relied on Dr. Akinsanya's opinion releasing Kirby to full-time light, sedentary, or medium work. (*Id.*) Based on these findings, Hartford concluded that Kirby was "physically capable of performing full-time Medium work." (AR at 109.)

16

Counsel for Kirby appealed the decision, supplementing the record with additional evidence, which included Dr. Akinsanya's response to a Social Security disability benefits questionnaire. (Def's MSJ, AF 53.) While this response indicated that Kirby was unable to work, Dr. Akinsanya's response was completed seven months before his report releasing Kirby to medium duty full-time work. (Def's MSJ, AF 54.) Prior to issuing its decision on appeal, Hartford also received an SSDI Notice of Decision which found Kirby disabled on account of chronic obstructive pulmonary disease, depression, history of tuberculosis, and his surgery. (Def's MSJ, AF 56, AR at 195.) Subsequent to receiving notice of this favorable decision, Hartford informed Kirby, in March, 2008, that it was upholding its decision that Kirby was not disabled as defined in the policy. (Def's MSJ, AF 57.) In reaching this decision, Hartford recognized that Kirby had received a favorable benefits determination from a Social Security Administration Administrative Law Judge, but it noted that its policy utilized a different standard of review. (*Id.*) The decision also noted that the additional evidence did not contradict Dr. Akinsanya's most recent determination that Kirby could work. (Def's MSJ, AF 58.) The letter informing him of the decision concluded that "the information in the claim file, viewed as a whole, supports that Mr. Kirby is capable of full time work up to the medium level and that he is vocationally employable in sedentary, light, and medium occupations." (AR at 184.)

17

## C.    Analysis

### 1.    Overview of ERISA Claims

ERISA § 502(a)(1)(B) provides a private right of action for beneficiaries under a covered plan to challenge a plan administrator's denial of benefits.  29 U.S.C. § 1132(a)(1)(B).  In order to take advantage of this private right of action, courts have imposed a requirement that plaintiffs exhaust the administrative remedies provided to them by their plan administrator.  *See Mason v. Continental Group, Inc.*, 763 F.2d 1219 (11th Cir. 1985); JAMES F. JORDAN, ET AL, ERISA LITIGATION § 5:04[B][3][a] (3d ed. 2008).   There is no question that Kirby has properly exhausted his administrative remedies.   When, as here, administrative remedies are properly exhausted and a beneficiary has sought review of the decision in federal court, ERISA provides no statutory standard of review under which a district court should scrutinize the administrative record.  In the absence of statutory standards of review, courts have applied judicially created ones.

### 2.    Applicable Standard of Review

The Supreme Court identified differing standards of review in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989). The Court in *Bruch* held that a *de novo* standard of review should be applied when a plan administrator lacked discretion, but if the administrator had been vested with discretionary powers, then the decision

18

should be subject to a "deferential" standard of review. *Id.* at 954-956. Additionally, if an administrator operates under a conflict of interest when it has been vested with discretion, then the conflict of interest must be considered as a "factor in determining whether there has been abuse of discretion." *Id.* at 115. Applying the guidelines set by the Supreme Court in *Bruch*, the Eleventh Circuit recognized that the "deferential" review due to the decision of an administrator vested with discretion meant that the decision should not be overturned unless "arbitrary and capricious." *Jett v. Blue Cross & Blue Shield of Alabama, Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989) (equating the arbitrary and capricious standard with an abuse of discretion standard). This highly deferential standard of review creates a strong preference in favor of a plan administrator's findings; these decisions cannot be overturned if they are reasonable. *See  HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 995 (11th Cir. 2001) (citing *Brown v. Blue Cross and Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1568 (11th Cir. 1990) (the same), *overruled in part by Doyle v. Liberty Life Assur. Co.*, 542 F.3d 1352 (11th Cir. 2008)).

When a conflict of interest exists, courts in the Eleventh Circuit until recently applied a so-called "heightened arbitrary and capricious" standard. *See Brown*, 898 F.2d at 1566-1567. This standard employed a burden-shifting approach under which, "when a plan beneficiary demonstrates a substantial conflict of interest on the part of

19

the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary

to prove that its interpretation of plan provisions committed to its discretion was not

tainted by self-interest." *Id.*

In applying these differing levels of scrutiny, the Eleventh Circuit has, until

recently, applied the following framework by which district courts could analyze a

plan administrator's decision:

> (1) Apply the *de novo* standard to determine whether the claim
> administrator's benefits-denial decision is "wrong" ( i.e., the court
> disagrees with the administrator's decision); if it is not, then end
> the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is " *de novo* wrong," then
> determine whether he was vested with discretion in reviewing
> claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is " *de novo* wrong" and he was
> vested with discretion in reviewing claims, then determine whether
> "reasonable" grounds supported it (hence, review his decision
> under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse
> the administrator's decision; if reasonable grounds do exist, then
> determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the
> decision.
>
> (6) If there is a conflict of interest, then apply heightened arbitrary
> and capricious review to the decision to affirm or deny it.

*Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1138

(11th Cir. 2004).

The above-described analytical framework was modified by the Supreme Court in *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2343 (2008), as interpreted by the Eleventh Circuit in *Doyle v. Liberty Life Assurance Co.*, 542 F.3d 1352. In *Doyle*, the Eleventh Circuit noted that *Glenn* "implicitly overrules and conflicts with our precedent requiring courts to review under the heightened standard a conflicted administrator's decision." *Id.* at 1359. In light of the changed standard, the court held "that the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious." *Id.* at 1360. Furthermore, it noted that "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." *Id.*

In light of *Glenn*, as interpreted by *Doyle*, the Court concludes that the previous six-step analysis has now been reduced to three. First, the Court must determine whether the plan administrator's decision to deny benefits was *de novo* wrong. Second, if the decision is *de novo* wrong, the court should determine

whether the plan has vested the administrator with discretion.[7]  Third and finally, if

the decision is *de novo* wrong <u>and</u> the administrator has discretion, the court must

determine whether "reasonable grounds" supported it, applying the more deferential

arbitrary and capricious standard.  In this third step, the court should consider the

effect of any conflicts of interest as part of its inquiry into whether the decision was

reasonable.

Having established the appropriate framework, the court now applies it to the

current facts in this case.

3.    <u>Application of Revised Framework to the Facts</u>

i.  Hartford's decision was *de novo* right.

A decision is "wrong" if, after a review of the decision of the administrator

from a *de novo* perspective, "the court disagrees with the administrator's decision."

*Williams*, 373 F.3d at 1138 & n. 8. "The court must consider, based on the record

before the administrator at the time its decision was made, whether the court would

reach the same decision as the administrator. If the court determines that the plan

administrator  was right, the analysis ends and the decision is affirmed." *Glazer v.*

_____

[7] Although the Court does not reach this issue, because it believes that Hartford's decision
is *de novo* correct, the Court has already decided the issue of whether Hartford retains discretion
under the plan in the course of addressing the Motion to Strike Plaintiff's Affidavit.  *See supra* at
2-5.

*Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008) (quoting

*Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1232 (11th Cir.2006)). *De*

*novo* review "offers the highest scrutiny (and thus the least judicial deference) to the

administrator's decision.  In fact, [the court] accord[s] no deference there, since no

judgment/discretion was exercised in making the determination." *Williams*, 373 F.3d

at 1137.  "*De novo* review essentially requires the Court to act as an insurance

adjustor and substitute its judgment for the judgment of the claim's administrator. A

decision is 'wrong' if a court disagrees with the administrator's decision." *Epolito*

*v. Prudential Ins. Co. of America*, 523 F. Supp. 2d 1329, 1341 (M.D. Fla. 2007)

(citing *Williams*, 373 F.3d at 1138)).

 Although the administrator's decision is not afforded any deference under *de*

*novo* review, under ERISA the plaintiff ultimately bears the burden to prove his or

her entitlement to benefits.  *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d

1038, 1040 (11th Cir. 1998).  In determining whether a plaintiff has satisfied this

burden, "courts have no warrant to require administrators automatically to accord

special weight to the opinions of a claimant's physician; nor may courts impose on

plan administrators a discrete burden of explanation when they credit reliable

evidence that conflicts with a treating physician's evaluation." *Black & Decker*

*Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  Additionally, while the court

may consider the fact that a plaintiff receives Social Security benefits, this fact alone is not dispositive.  *Paramore v. Delta Air Lines*, 129 F.3d 1446, 1452 (11th Cir. 1997).

After reviewing the administrative record and Hartford's decision finding that Kirby was not disabled under the terms of the plan, the Court finds that Hartford's decision was *de novo* correct.   The Court reaches this conclusion primarily because of the fact that Kirby's own treating physician cleared him for medium level work, the functional capacity revealed by Hartford's surveillance, and Kirby's own admissions as to his functional capacity.

In support of his argument that Hartford's decision was *de novo* wrong, Kirby claims that the termination of benefits is "based on surveillance, and a one word response from Dr. Akinsanya to a letter . . . claiming that the surveillance revealed greater functionality than Plaintiff's statement."  (Doc. 21 at 18.)  Further, Kirby argues that "[t]here was no basis for conducting surveillance."  (*Id.*)  Finally, Kirby relies on the award of SSA benefits in his favor and Dr. Wilson's psychological evaluation that confirms depression.  (*Id.* at 19-24.)

Kirby also contends that Dr. Akinsanya most recently found him to be disabled in March, 2007, when he completed a Social Security Disability Questionnaire.  (AR 276.)  This finding, Kirby argues, in conjunction with the award

24

of SSDI, outweighs Dr. Akinsanya's opinion, dated more than seven months <u>later</u>, releasing Kirby to perform medium work. (Doc. 21 at 20.) The Court disagrees with this conclusion.

As Hartford argues in its brief, Dr. Akinsanya's Social Security Disability Questionnaire was submitted more then seven months prior to Kirby's release from work and prior to the surveillance that Hartford conducted. (Doc. 15 at 23.) Further, Dr. Akinsanya was provided with Hartford's surveillance tapes, allowing him to rely on more than simply Hartford's summary of the information. (Def's MSJ AF 46, 48.) After viewing this evidence, Dr. Akinsanya concluded that Kirby was not disabled and released him to work.

Kirby points to no medical evidence that contradicts Dr. Akinsanya's conclusion, opting instead to offer his own conclusion that Dr. Akinsanya's conclusion was "not sufficient evidence on which to terminate benefits" and that it is somehow less credible because he provided only a "one word answer." (Doc. 21 at 20.) The Court rejects this argument. Dr. Akinsanya's determination that Kirby should be released to full-time work represents the most recent opinion of Kirby's only treating physician, and it is the only opinion that is based on the most complete information available. (*See* Doc. 23 at 5-6.) Hartford's decision is also supported by Kirby's own admissions subsequent to Hartford's surveillance. In an interview

25

following the taping, Kirby made several false statements about his functional capacity, including his inability to use stairs, and his need for a cane or electronic chair to have mobility.  Kirby also admitted that he lifted weights with fifty pound barbells with his right and left arms, performing between five and ten repetitions, two to three times a day.  (AR at 753.)  Thus, Dr. Akinsanya's "one word answer" is irrefutably supported by Kirby's own admissions and the surveillance data.

Kirby also cannot overcome the damaging effect of Dr. Akinsanya's opinion by relying on his award of SSDI benefits.  The Eleventh Circuit has noted that the approval of disability benefits by the Social Security Administration is not dispositive as to whether a claimant satisfies the requirements for disability under a plan covered by ERISA.  *See Whatley v. CNA Ins. Co.*, 189 F.3d 1310, 1314 n. 8 (11th Cir. 1999) ("We note that the approval of disability benefits by the Social Security Administration is not considered dispositive on the issue of whether a claimant satisfies the requirement for disability under an ERISA-covered plan. "); *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1452 n. 5 (11th Cir. 1997) ("Although a court may consider this information in reviewing a plan administrator's decision regarding eligibility for benefits under an ERISA-governed plan, an award of benefits by the Social Security Administration is not dispositive of the issue before us.") (citations omitted).  Additionally, the Supreme Court has explained that

there are "critical differences between the Social Security disability program and ERISA benefit plans." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003). "In determining entitlement to Social Security benefits, the adjudicator measures the claimant's condition against a uniform set of federal criteria. The validity of a claim to benefits under an ERISA plan, on the other hand, is likely to turn, in large part, on the interpretation of the terms in the plan at issue." *Id.* at 823.

Kirby initially argues that the Court must consider the SSA award and that it cannot disregard an SSA award "without valid reasons and a sufficient explanation." (Doc. 21 at 21.) These two arguments are entirely unsupported by controlling case law. In fact, Eleventh Circuit case law, as cited above, supports quite the opposite conclusion. A court <u>may</u> consider an award of social security benefits, but it is certainly not <u>required</u> to do so. *See Paramore*, at 1452 n. 5. Even if the Court does consider such an award, the award is not dispositive. *Id.* This is the precise reason why the Supreme Court recognized that there are "critical differences between the Social Security disability program and ERISA benefit plans." *Black & Decker Disability Plan*, 538 U.S. at 832. There is simply no requirement that, in an ERISA case, the Court must point to "substantial evidence" for reaching a conclusion

contrary to a social security benefits award.[8]

Hartford had good reason to disregard the ALJ's social security decision.  The ALJ did not receive or consider Hartford's surveillance evidence or Dr. Akinsanya's release of Kirby to full-time work.  (AR at 199.)  In fact, the most recent records that the ALJ considered from Dr. Akinsanya were a disability questionnaire completed in March, 2007, prior to the surveillance that Hartford conducted.  (*Id.*) Hartford correctly gave little weight to this determination, because the ALJ did not have all of the relevant evidence at the time she awarded benefits.  The record before this Court suggests that Kirby grossly exaggerated his functional capacity, and at times he outright lied about his medical history to Hartford's examiners and to his own treatment team. The Court will not speculate as to whether, if the ALJ has been apprised of all facts currently before this Court, Kirby would have received a favorable benefits determination, even under the separate standards that apply under the Social Security Act.

Besides his SSDI benefits determination, perhaps the only current evidence that tacitly supports Kirby's continued claim for benefits is Dr. Wilson's assessment

---

[8]  The Court is also under the impression that Kirby's counsel may have erroneously "pasted" this argument in from another brief, as the brief mentions symptoms that do not otherwise appear in the record or in any other part of the briefing, such as chronic pain. (Doc. 21 at 22.)

that Kirby could not likely function in a work setting.  (AR at 324.)  However, as discussed below, this is not a reliable conclusion that is worthy of credence.

Kirby was referred to Dr. Wilson in 2007 by his attorney.  (AR at 320.)  The record indicates that Kirby saw Dr. Wilson only on one occasion and is not undergoing any further treatment from him at this time. (AR at 107.)  Based on this sole consultive examination, Dr. Wilson concluded that Kirby "presented as an angry and agitated individual," and that it was "unlikely that he could function in a work setting."  (AR at 324.)

However, Dr. Wilson's conclusions are undermined by his relative lack of familiarity with Kirby–he only examined him on one occasion–and the fact that Kirby provided him with false information during this single examination.  In concluding that Kirby would not function well in a work environment, Dr. Wilson wrote that Kirby was angry and agitated because he "apparently has had someone tell him that he was 'faking' and that he could go back to work, even though he has had what appears to be some serious problems related to his lung cancer." (*Id.*)  Kirby explained to Dr. Wilson that not only had he undergone surgery for lung cancer in 2002, but that he was continuing to undergo treatment for lung cancer. (AR at 320.) Kirby claimed mental problems due to "what [had] happened to [him]." (*Id.*)  There is no evidence of any treatment for lung cancer in Kirby's medical records; Dr.

Wilson's conclusions are based almost entirely on Kirby's fabricated story that he suffers from lung cancer. Thus, Dr. Wilson's opinions are based on misinformation from Kirby and are therefore not worthy of a great amount of weight in reviewing Hartford's decision.[9] Underscoring this conclusion is the fact that Kirby is undergoing no additional psychotherapy and is not being treated with any anti-depressant medication. Additionally, Dr. Wilson did not engender much confidence in his prior opinion since, when confronted by Kirby's false statements and Hartford's surveillance data, he responded that he was "unable to comment." (*See* Def's MSJ, AF 47.)

Finally, a Hartford representative personally interviewed Kirby and found that he "was able to understand the questions and provide cogent responses," and that he "was able to maintain his concentration and focus throughout the entire interview process." (AR at 346.) Kirby's own demeanor during his interview indicates that he had the mental capability to function in a job setting.

In light of the above, the Court finds that the evidence weighs heavily in favor of denying Kirby's claim for benefits. No credible evidence supports Kirby's claim for continued benefits, and the most current and reliable evidence from Kirby's only

---

[9] For similar reasons, Kirby's affidavit, stating that he suffers from depression and emotional problems, is not entitled to much weight by the Court, and it has little effect upon this *de novo* review of the administrator's decision.

treating physician supports a finding that Kirby is not "disabled" under the terms of Hartford's policy.  Thus, the Court finds that Hartford's decision is *de novo* correct. Summary judgment is due to be **GRANTED** in favor of Hartford.

           ii.       There is no shifting burden of proof in ERISA cases.

Although it has determined that Hartford's decision was *de novo* correct, effectively deciding this case, the Court pauses to discuss Kirby's argument that the ultimate burden of proof has shifted to Hartford, since it previously awarded benefits to Kirby.  (Doc. 21 at 25.)  This argument relies heavily upon the Eleventh Circuit's decision in *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321 (11th Cir. 2001).  This Court has previously considered (and rejected) an identical argument from Kirby's counsel in *Scott v. Prudential Life Ins. Co.*, No. 07-CV-2166-VEH (N.D. Ala. 2008) (Doc. 18), a separate ERISA case decided on *de novo* grounds. Below, the Court explains, as it did in *Scott*, why there is no shifting burden of proof in ERISA cases:

> In *Levinson,* the court found that Reliance's decision was wrong from a *de novo* standard as well as the more deferential arbitrary and capricious standard.  245 F.3d at 1327.  Having reached this conclusion, the court then turned to Reliance's argument that the district court had improperly required it prove that Levinson was disabled, since it had never determined him to be disabled in the first place.  *Id.* at 1330-1331.
>
> Reliance contends that <u>when the court found that Levinson</u>

<u>was disabled</u>, it wrongly switched the burden to Reliance to prove Levinson was no longer disabled in order to end benefits . . . . Levinson submitted documents in this litigation that showed he still had a heart condition that two physicians agreed precluded him from performing the material duties of his occupation on a full-time basis. Thus, he submitted proof that he was still "Totally Disabled" under Reliance's plan. <u>Because Levinson satisfied his obligations under the terms of the plan, Reliance had to produce evidence showing that Levinson was no longer disabled in order to terminate his benefits</u>.

*Id.* at 1331. (emphasis added). This holding was in light of the specific language of the policy at issue, which required "[u]nder the language of the plan, once Levinson became eligible for monthly benefits, those benefits would not terminate until 'the date [he] ceases to be permanently disabled,' or 'the date [he] fails to furnish the required proof of Total Disability.'"*Id.* at 1329. Having demonstrated <u>under the terms of his plan</u> that he was disabled, Reliance was required to show that he was no longer disabled. Thus, *Levinson*'s use of a burden-shifting approach is limited to its facts.

　　The Eleventh Circuit has not revisited the language it used in deciding this portion of *Levinson*, but several district courts in this circuit have. For instance, in *Onofrieti v. Metropolitan Life Ins. Co.*, 320 F. Supp. 2d 1250 (M.D. Fla. 2004), the plaintiff advanced the same burden-shifting argument as [Plaintiff] now does. *Id.* at 1254. ("Relying on [*Levinson*], Plaintiff argues that Defendant bears the burden of demonstrating that Plaintiff is not disabled under the terms of the plan, because Plaintiff received benefits for several years."). The district court rejected this argument, because "[t]he *Levinson* court shifted the burden to the defendant to show that the plaintiff was not [sic] longer disabled, but the court did so not because the defendant had been paying benefits previously, but because the plaintiff had presented evidence that he met the definition of disabled under the plan." *Id.*

　　Similarly, in *Barchus v. Hartford Life and Accident Ins. Co.*,

320 F. Supp. 2d 1266 (M.D. Fla. 2004), the plaintiff advanced the same argument based on *Levinson*. *Id.* at 1286. As in *Onofrieti*, the district court rejected this argument, noting "[c]ontrary to the Plaintiff's contentions, the Eleventh Circuit's decision in [*Levinson*] does not stand for the proposition that once benefits are approved, the burden shifts to the claims administrator to establish that the claimant is no longer 'totally disabled.'" *Id.* at 1286-1287. It further reasoned, "[in *Levinson*], the court concluded that the claimant met his initial burden under the policy of establishing his total disability and that, consequently, the defendant was required to produce evidence that the claimant was no longer disabled in order to justify its decision to deny benefits." *Id.* Applying this reading of *Levinson*, the court rejected the plaintiff's argument because the defendant had subsequently determined that the plaintiff did not show total disability under the plan (even though it had initially determined the plaintiff to be totally disabled) and because the claims administrator did not simply re-evaluate the same evidence in making its subsequent decision, but instead considered new evidence. *Id.*

Finally, as an additional point of comparison, the court in *Salter v. Continental Casualty Co.*, No. 5:03-CV-221-DF, 2004 WL 5573421 (M.D. Ga. Oct. 29, 2004), applied *Levinson* in the same manner as the courts in the above cited decisions. The court recognized that "[*Levinson*'s] burden-shifting framework would be appropriately applied after a determination by this Court that Defendant's decision to deny Plaintiff LTD benefits under an 'any occupation' standard was arbitrary and capricious." *Id* at *6. Because the plaintiff never met her burden under the "any occupation" standard (a standard similar to the one [Plaintiff] must meet under the terms of his plan in order to receive LTD benefits) and the court had not found the administrator's decision to be arbitrary and capricious, the court rejected the argument. *Id.*

This Court reaches the same conclusion as the three above-cited district court decisions. *Levinson* does not apply to the instant case. Unlike the plaintiff in that case, [Plaintiff] has not demonstrated that he is entitled to receive benefits under the plan. He has not met the "unable to perform the duties of any gainful

occupation" standard.   Additionally, *Levinson* turned on the plaintiff's satisfying the term "total disability" within the meaning of his particular plan and, upon this showing, the plan contractually required the administrator to demonstrate that the plaintiff ceased to be permanently disabled. 245 F.3d at 1329. Finally, *Levinson*'s use of burden-shifting and the refusal to engage in burden-shifting in the three cited district court cases all occurred when the court applied the arbitrary and capricious standard, and not the *de novo* standard, which occurs at a different stage of the *Williams* framework, as modified by *Glenn* and *Doyle*. Thus, *Levinson*'s use of burden-shifting does not apply in this case.

Thus, Hartford does not bear the burden of proof in this case.  In fact, as the Eleventh Circuit has recognized, Kirby bears the ultimate burden of proving that he was entitled to benefits under the terms of the contract.  *See Horton*, 141 F.3d at 1040.  Here, the evidence weighs heavily against Kirby. The only physician who saw Kirby with any regularity released him to full-time medium work.  Video evidence captured Kirby performing at a much higher level of functionality than he self-reported, and Kirby's own subsequent interview admitted that the video was accurate and reflected his ability to function.   In light of this evidence, and the lack of any evidence to the contrary, Hartford found that Kirby was not disabled.  Unlike the plaintiff in *Levinson*, Kirby has not demonstrated that he is "disabled" under the terms of the policy.

          2.      <u>There is no violation of the due process clause of the Fifth or Fourteenth Amendments, nor is there a violation of any</u>

procedural rights in the applicable ERISA plan.

In a final attempt to attack Hartford's decision, Kirby attempts to argue that the due process clause of either the Fifth or the Fourteenth Amendment (he does not specify which amendment) protects his continued receipt of benefits, because the basis of his termination "was not substantial." (Doc. at 29.) Kirby initially relies on Social Security cases in order to prove his argument. However, as discussed *supra*, ERISA differs substantially from the Social Security Act. Although there are other fundamental differences between ERISA and the Social Security Act, the most critical distinction between the two acts for purposes of this argument is the difference between government action and private action. It would be possible to raise a due process challenge to a Social Security benefits determination because it amounts to a "governmental decision." *See Matthews v. Eldridge*, 424 U.S. 319, 332 (1976) ("Procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment. The Secretary does not contend that procedural due process is inapplicable to terminations of Social Security disability benefits."). However, there is no such analogue under ERISA, since a decision to terminate benefits is made by a private actor, in this case an insurer, and not a government actor. A decision by Hartford to terminate benefits does not

35

involve government action, therefore it does not amount to a constitutional wrong. Thus, Kirby's constitutional due process challenge is due to fail.

Kirby does cite to two ERISA cases from the Sixth Circuit, *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609 (6th Cir. 1998), and *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286 (6th Cir. 2005), which refer to "due process" in a looser sense–in discussing procedural rights afforded by an insurance policy (and not the Constitution). However, this "due process" argument also does not apply.

The cases cited by Kirby involve challenges to supposed procedural defects in an insurer's claims process as part of arbitrary and capricious review.  For instance, in *Calvert*, the court applied the arbitrary and capricious standard to an administrator's denial of benefits.  The plan administrator had relied on a file review alone and had discredited the "objectively verifiable" decisions of the SSA and the plaintiff's own treating physician.  409 F.3d at 297.  Considering this evidence and the plan administrator's conflict of interest, the court found that the decision was arbitrary and capricious.  *Id.*  The only portion of the opinion where "due process" is discussed is in a footnote where the court explains, citing *Wilkins*, the effect of a conflict of interest, noting that it is permissible to engage in discovery as part of an ERISA case when the claimant "seeks to pursue a decision-maker's bias."  *Id.* at 293 n. 2.  The court further discussed the procedural defects of the review when noting

36

that, although the plan at issue specifically provided for in-person review, the administrator had conducted only a "paper" review.  *Id.* at 295 ("[W]e find that the failure to conduct a physical examination-especially where the right to do so is specifically reserved in the plan-may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.").

*Calvert*  does not apply to this case.  The administrator in *Calvert* relied only on a file review, which did not occur in this case–Kirby was interviewed personally–and Kirby's own doctor released him to work.  Additionally, Kirby apprises the Court of no procedural "right" that was ignored in this case, as occurred in *Calvert*.  Therefore, Kirby's "due process" argument is not supported by evidence or case law and does not invalidate Hartford's decision to terminate benefits.

## IV.   CONCLUSION

For the reasons discussed above, the Court finds that Hartford's Motion for Summary Judgment (Doc. 14) is due to be **GRANTED**.  Kirby's Motion for Judgment on the Record (Doc. 11) is due to be **DENIED**.  Finally, Hartford's Motion to Strike Plaintiff's Affidavit (Doc. 17) is due to be **DENIED**.  A separate order will be entered contemporaneously with this opinion.

**DONE** and **ORDERED** this the 6th day of March, 2009.

**VIRGINIA EMERSON HOPKINS**
United States District Judge